IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
AMARILLO DIVISION

| | |
|---|---|
| OCCUNET, LLC, | |
| Plaintiff, | |
| v. | 2:25-CV-039-Z-BV |
| PREMIER HEALTHCARE SOLUTIONS, INC., *et al.*, | |
| Defendants. | |

**MEMORANDUM OPINION AND ORDER**

Before the Court are two Motions to Dismiss: Defendant Premier Healthcare Solutions, Inc.'s Motion ("Premier's Motion") (ECF No. 21), and Defendant Three Rivers Provider Network Direct Pay, Inc.'s Motion ("TRPN's Motion") (ECF No. 24), both filed May 6, 2025. Plaintiff OccuNet, LLC responded to both Motions on May 27, 2025. ECF Nos. 32, 33. Defendants replied on June 10, 2025. ECF Nos. 35, 36. The Motions are now ripe. Having reviewed the Motions, briefing, and relevant law, Premier's Motion is **GRANTED** and TRPN's Motion is **GRANTED**.

BACKGROUND

This case concerns approximately ten months of negotiations between Premier and OccuNet—and the three agreements that resulted. Premier, a healthcare-improvement company, announced in January 2024 plans to sell Contigo Health, one of its business lines. ECF No. 21 at 6. On April 30, 2024, Premier and OccuNet executed a Confidentiality Agreement regarding OccuNet's potential purchase of Contigo. ECF Nos. 21 at 6, 32 at 7. In general, the Confidentiality Agreement set delineated the confidentiality duties of each party during negotiations and expressly disclaimed liability if the negotiations did not result in a

final transaction, continuing for "a period of three (3) years from the Effective Date [of April 30, 2024]." ECF Nos. 21 at 6–7, 32 at 7, 7-1.

The parties then signed a second agreement: the Exclusivity Agreement. ECF Nos. 21 at 7, 32 at 8–9. This agreement imposed restrictions on Premier's ability to disclose its ongoing negotiations with OccuNet or solicit or facilitate third-parties. *Id*. The Exclusivity Agreement stated that it, "together with the [Confidentiality Agreement] and the Clean Team Agreement,[1] constitute[d] the entire agreement between the parties concerning, and supersede[d] any prior agreements with respect to, the subject matter hereof." ECF No. 7-2. However, no final transaction occurred, and the Exclusivity Agreement expired by its express terms on September 10, 2024. *Id*. (setting an "Exclusivity Period" of fourteen days from the date of the agreement's execution, with two automatic, seven-day extensions if good-faith negotiations were still ongoing).

Two months later, around November 27, 2024, negotiations resumed. ECF No. 21 at 8. The parties entered into a third agreement: the November Agreement. *Id*.; ECF No. 32 at 9. The November Agreement operated as a second exclusivity agreement and set terms for continued negotiations for just one of Contigo's assets (the "Network"). Importantly, the November Agreement offered OccuNet "exclusivity to close [the] deal through the 13th of December." ECF No. 7-4 (citation modified). But by that date, the parties again failed to close a transaction. ECF No. 21 at 8.

In January 2025, Premier "finalized terms to sell the Network assets to [TRPN]." ECF No. 21 at 8. On February 21, 2025, OccuNet filed suit. In its Amended Complaint, OccuNet brings claims for (1) breach of the Exclusivity Agreement against Premier for improperly disclosing information about the transaction; (2) breach of the November

---

[1] The Clean Team Agreement is not at issue in the instant dispute. *See* ECF No. 32 at 13 n.24.

2

Agreement against Premier for selling the Network assets to TRPN; (3) promissory estoppel against Premier; (4) breach of the implied duty of good faith and fair dealing against Premier; and (5) tortious interference with a contract against TRPN. ECF No. 7.

**LEGAL STANDARD**

Under Federal Rule of Civil Procedure 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim for relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Courts should "construe facts in the light most favorable to the nonmoving party"—here, Plaintiff—"as a motion to dismiss under 12(b)(6) 'is viewed with disfavor and is rarely granted.'" *Turner v. Pleasant*, 663 F.3d 770, 775 (5th Cir. 2011) (quoting *Harrington v. State Farm Fire & Cas. Co.*, 563 F.3d 141, 147 (5th Cir. 2009)).

**ANALYSIS**

**I. Choice of Law**

A federal court sitting in diversity applies state substantive law to a plaintiff's state law claims. *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 78–79 (1938). Thus, a federal court must also determine *which* state's substantive law applies—making choice of law a threshold inquiry in diversity jurisdiction cases. *See, e.g., R.R. Mgmt. Co., L.L.C. v. CFS La. Midstream Co.*, 428 F.3d 214, 222 (5th Cir. 2005).

Although neither party initially engaged in a substantive choice-of-law analysis, the Court must do so here. *See* ECF No. 25 at 14 (noting that Plaintiff "does not allege any particular choice-of-law analysis" and "instead assumes without explanation that Delaware law applies"). This is because Plaintiff's claims primarily relate to the Confidentiality Agreement and Exclusivity Agreement, each specifying a different governing law: the Confidentiality Agreement designates North Carolina law, whereas the Exclusivity

3

Agreement designates Delaware law. ECF No. 7-1 at 6, 7-2 at 3. Thus, the Court considers—and asked the parties to brief—which state's law properly governs. *See* ECF No. 40.

When sitting in diversity jurisdiction, a federal court must apply the choice-of-law rules of the forum state—here, Texas. *R.R. Mgmt. Co., L.L.C.*, 428 F.3d at 222 (citing *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496–97 (1941)). Importantly, Texas law states that "[i]f the laws of the states do not conflict, then no choice-of-law analysis is necessary." *Schneider Nat'l Transp. v. Ford Motor Co.*, 280 F.3d 532, 536 (5th Cir. 2002) (quoting *W.R. Grace & Co. v. Cont'l Cas. Co.*, 896 F.2d 865, 874 (5th Cir. 1990)). In the absence of a conflict, the law of the forum state—Texas—applies. *Id.* Where the potentially applicable laws are inconsistent, though, Texas courts decide choice-of-law issues by using the Restatement (Second) of Conflict of Law. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971); *ECL Group, LLC v. Mass*, No. 3:17-CV-2399, 2018 WL 949235, at *5 (N.D. Tex. Feb. 20, 2018) ("[T]he court applies Texas choice-of-law rules, specifically the Restatement (Second) of Conflict of Laws . . . ."). Under Restatement Section 187, a Texas court will enforce a contractual choice-of-law provision unless (1) the chosen state has no substantial relationship to the parties or transaction, or (2) the chosen state's law is contrary to the fundamental policy of a state which has a materially greater interest in the determination of the particular issue. *See* RESTATEMENT (SECOND) OF CONFLICT OF LAWS § 187 (1971); *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 677 (Tex. 1990).

If the agreements were considered separately, a Texas court would apply each contractual choice-of-law provision to its respective contract. The Confidentiality Agreement would be governed by North Carolina law, as Premier's principal place of business is North Carolina and nothing in the Confidentiality Agreement is contrary to a fundamental policy of the State of Texas. The Exclusivity Agreement would be governed by Delaware law, as

4

Delaware is the state of Premier's incorporation, and nothing in the Exclusivity Agreement is contrary to a fundamental policy of the State of Texas. But the inquiry does not end here. As the parties correctly ask, "what happens where the two contracts are *both* in issue and have different choice of law provisions?" ECF No. 41 at 3. This appears to be a question of first impression for the Court.

The Court again applies Texas conflict-of-law principles. *See, e.g., Klaxon*, 313 U.S. at 496; *R.R. Mgmt. Co., L.L.C.*, 428 F.3d at 222. As an initial matter, then, the Court determines whether Delaware and North Carolina law conflict as to the question of which choice-of-law provision would govern between the two contracts. *See Schneider Nat'l Transp.*, 280 F.3d at 536 (quoting *W.R. Grace & Co.*, 896 F.2d at 874) ("If the laws of the states do not conflict, then no choice-of-law analysis is necessary."). They do not. In support, the parties cite two helpful cases: *Standard General L.P. v. Charney* and *North Star Management of America, LLC v. Sedlacek*. No. CV 11287, 2017 WL 6498063 (Del. Ch. Dec. 19, 2017); 235 N.C. App. 588 (2014). Both cases confront the issue of numerous agreements with differing choice-of-law provisions. In *Standard General*, the court notes the agreements at issue "clearly manifest an intention to have either Delaware or New York law apply by including express choice of law language." 2017 WL 6498063, at *9. This, said the court, largely demonstrates "the parties' clear intention to have the Agreements read together to encompass their entire relationship." *Id.* at 10. As a result, the court applied Delaware law to all claims and affirmative defenses arising from the agreements with Delaware choice-of-law provisions, yet applied New York law to all claims and affirmative defenses arising from agreements with New York choice-of-law provisions. *Id.* Similarly, *North Star Management* reflects the idea that seemingly conflicting provisions should be harmonized when reflective of the parties' intent.

5

Here, Delaware and North Carolina law can peacefully coexist. And, just as in *Standard General* and *North Star Management*, the parties' intent is also instructive. Premier argues that "the parties' subsequent agreements, including the Exclusivity Agreement, expressly do ***not*** alter the terms of the Confidentiality Agreement." ECF No. 21 at 11 (emphasis in original). Premier then states that "[t]he Exclusivity Agreement is unambiguous that it is '[i]n *addition to* the provisions of the [Confidentiality Agreement] . . . which remain[s] in full force and effect regarding the transactions contemplated by this letter agreement and the Potential Transaction' and that the Exclusivity Agreement is to be read 'with the [Confidentiality Agreement]' as the 'entire agreement between the parties.'" *Id.* (emphasis added) (quoting Exclusivity Agreement §§ 3, 5). OccuNet agrees, stating that "the Exclusivity Agreement and Confidentiality Agreement are to be considered together as one Agreement." ECF No. 32 at 13. Accordingly, the contracts must be read together to the extent possible, and the law stipulated in each agreement applies to the claims or rights that are given or arise thereunder.

With this in mind, the Court considers the applicable law as to each of OccuNet's claims—breach of contract, promissory estoppel, breach of the implied duty of good faith and fair dealing, and tortious interference—as well as Premier's contract defense. OccuNet's claims for breach of contract, promissory estoppel, and breach of the implied duty of good faith and fair dealing pertain to the Exclusivity Agreement; thus, those claims are governed by Delaware Law. *See* ECF No. 41 at 5–6 (the parties agreeing that "OccuNet's contract and quasi-contract claims under the Exclusivity Agreement are governed by Delaware Law"). Conversely, Premier's contract defense that the Confidentiality Agreement bars OccuNet's claim is governed by North Carolina law. All that remains is Premier's claim of tortious interference against TRPN. As Texas is the place of incorporation and principal place of

6

business for OccuNet, and Nevada is the place of incorporation and principal place of business for TRPN, the Court must engage in yet another choice-of-law analysis.

First, the Court determines whether a meaningful difference exists between Texas and Nevada law regarding tortious interference. *See Schneider Nat'l Transp.*, 280 F.3d at 536 (quoting *W.R. Grace & Co.*, 896 F.2d at 874) ("If the laws of the states do not conflict, then no choice-of-law analysis is necessary."). It does not. Under Texas law, tortious interference requires (1) the existence of a contract; (2) the willful or intentional act of interference; (3) that was a proximate cause of damages; and (4) actual damage or loss occurred. *See* ECF No. 41 at 7–8; *5636 Alpha Rd. v. NCNB Tex. Nat'l Bank*, 879 F. Supp. 655, 662 (N.D. Tex. 1995) (citing *Pers. Preference Video, Inc. v. Home Box Office, Inc.*, 986 F.2d 110, 111 (5th Cir. 1993)). By contrast, tortious interference under Nevada law requires (1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage. *J.J. Indus., LLC v. Bennett*, 119 Nev. 269, 274 (2003). Although Nevada explicitly requires a defendant's knowledge of the contract, Texas does so as well, albeit implicitly. *See, e.g., CPM Consulting LLC v. Capsugel US, LLC*, No. 3:17-CV-3059, 2019 WL 3769651, at *2 (N.D. Tex. Aug. 9, 2019) ("For the act of interference to be intentional or willful, '[t]he interfering party must know of the existence of a contract between the plaintiff and a third party . . .'" (citing *Hill v. Heritage Res., Inc.*, 964 S.W.2d 89, 123 (Tex, App.—El Paso 1997, pet. denied))). Therefore, there is no *true* substantive conflict between Texas and Nevada law on tortious interference, and Texas law applies. *Schneider Nat'l Transp.*, 280 F.3d at 536 (quoting *W.R. Grace & Co.*, 896 F.2d at 874).

The Court summarizes the above analysis as follows: (1) OccuNet's claims for breach of contract, promissory estoppel, and breach of the implied duty of good faith and fair dealing

are governed by Delaware Law; (2) OccuNet's claim for tortious interference is governed by Texas law; and (3) Premier's contract defense that the Confidentiality Agreement bars OccuNet's claim is governed by North Carolina law.

## II. Waiver of Claims

The Court begins with Premier's argument that OccuNet waived its claims against Premier. Premier states that "OccuNet cannot plausibly allege any cause of action arising out of Premier's pre-closing conduct because it *expressly waived* any such claims" for a period of three years without limitation. ECF No. 21 at 10 (emphasis in original). According to Premier, the Confidentiality Agreement states that "[OccuNet] ***shall not have any claims whatsoever against Premier*** . . . nor against any third party with whom a transaction may be entered into with Premier or its affiliates (except as may be agreed in a final definitive written agreement with [OccuNet] regarding the Purpose)." *Id.* (emphasis in original). Premier further notes the parties' subsequent agreements—including the Exclusivity Agreement—expressly do not alter the terms of the Confidentiality Agreement.[2] *Id.* at 11. Thus, according to Premier, because "Premier and OccuNet never entered into any 'final definitive written agreement,'" OccuNet "cannot escape its express waiver of its claims." *Id.*

OccuNet disagrees. OccuNet claims it brings the instant suit "against Premier for breach of the Exclusivity Agreement and the November Agreement." "The Confidentiality Agreement does not contemplate—let alone waive—those claims." ECF No. 32 at 10. The Confidentiality Agreement states that OccuNet shall not have any claims "*by virtue of*" that Agreement; here, OccuNet "has not sued Premier for breach of any obligation 'by virtue of

---

[2] The Exclusivity Agreement states that it exists "[i]n addition to the provisions of the [Confidentiality Agreement] . . . which remain[s] in full force and effect regarding the transactions contemplated by this letter agreement and the Potential Transaction" and that the Exclusivity Agreement is to be read "with the [Confidentiality Agreement]" as "the entire agreement between the parties." ECF No. 21 at 11.

8

[the Confidentiality Agreement]' to enter into a business transaction." *Id.* at 10–11 (emphasis in original). Instead, "OccuNet has sued Premier for breach of its obligations under the later Exclusivity Agreement and November Agreement." *Id.* at 11. OccuNet further contends that it could not relinquish the right to sue under the Exclusivity and November Agreements, as those "did not exist until months later." *Id.* at 12. Finally, OccuNet believes that if it "shall not have any claims" for breach of the Exclusivity Agreement, then OccuNet has "no mechanism to enforce it and its obligations on Premier are illusory." *Id.* at 14.

As discussed above, the Court applies North Carolina law in determining the question of waiver. *See supra*, at 8. A foundational concept is that all terms in a contract are to be "interpreted according to their usual, ordinary, and commonly accepted meaning." *Anderson v. Allstate Ins. Co.*, 266 N.C. 309, 312 (1966). "Where the terms of the contract are not ambiguous, the express language of the contract controls in determining its meaning and not what either party thought the agreement to be." *Crockett v. First Fed. Sav. & Loan Ass'n*, 289 N.C. 620, 631 (1976). To be sure, "it is the duty of the court to construe [a contract] as it is written, not to rewrite it and thus make a new contract for the parties." *Allstate Ins. Co. v. Shelby Mut. Ins. Co.*, 269 N.C. 341, 346 (1967). Considering this principle, the examines the relevant language of the Confidentiality Agreement, located in the Preamble and Section 11. Although excerpted above, the pertinent language of the Agreement states in full as follows:

> This Agreement and the obligations hereunder shall continue for a period of three (3) years from the Effective Date . . . .
>
> \*   \*   \*
>
> **No Obligation.**    Each Party agrees that unless and until a final definitive written agreement regarding the Purpose has been executed and delivered, neither Party or their affiliates will be under any legal obligation of any kind whatsoever regarding the Purpose or to enter into any business relationship or transaction by virtue of this Agreement except for the confidentiality and non-use matters specifically agreed to herein. . . .
>
> \*   \*   \*

9

> (d) the Interested Party [OccuNet] shall not have any claims whatsoever against Premier or its Representatives or affiliates or any of their respective directors, officers, stockholders, owners, or agents arising out of or relating to any transaction involving Premier, not against any third party with whom a transaction may be entered into with Premier or its affiliates (except as may be agreed in a final definitive written agreement with the Interested Party regarding the Purpose). . . .

ECF No. 7-1 at 5. What's more, "under North Carolina law, releases and waivers of claims generally are enforceable and are governed by principles of ordinary contract law." *Edwards v. UBS Tr. Co., N.A.*, No. 3:05-CV-228, 2005 WL 8179617, at *3 (W.D.N.C. Aug. 2, 2005); *Adder v. Holman & Moody, Inc.*, 288 N.C. 484, 492 (1975).

Although OccuNet may dislike the plain language of the Confidentiality Agreement, its terms are not ambiguous: in short, OccuNet may not have any claims against Premier, or any third party involved in a transaction with Premier, for a period of three years unless an executed, *final* written agreement expressly contemplates such claims. This understanding comports with the text's usual, ordinary, and commonly accepted meaning. Consequently, because OccuNet and Premier did not execute a final written agreement, OccuNet is contractually barred for three years from filing any claims against Premier, or third parties that transact with Premier. The Confidentiality Agreement was signed on August 13, 2024, and the instant suit filed by OccuNet less than one year later on February 21, 2025. ECF No. 21 at 7–8. Thus, the ordinary and commonly accepted reading of the Confidentiality Agreement holds here: OccuNet is expressly prohibited from continuing its claims against Premier.

That OccuNet and Premier later entered into subsequent agreements is of no consequence. The parties do not disagree that the Exclusivity Agreement is to be read "with the [Confidentiality Agreement]" as the "entire agreement between the parties." ECF Nos. 21 at 11; 32 at 12–13. And, notably, the Exclusivity Agreement explicitly states that the

provisions of the Confidentiality Agreement remain "in full force and effect." ECF No. 7-2 at 3. This means that the Confidentiality Agreement, together with the parties' subsequent agreements, constitutes a collective and harmonious contractual scheme "as the parties clearly intended." ECF No. 41 at 5. Thus, despite OccuNet's contention to the contrary, the Confidentiality Agreement *does* contemplate and waive claims arising from the entire collective, contractual scheme—including alleged breach arising under the later Exclusivity and November Agreements. Finally, OccuNet's concern that it has "no mechanism to enforce [breaches of the Exclusivity Agreement]," making obligations on Premier illusory, is also misplaced. ECF No. 32 at 14. OccuNet may enforce an alleged breach three years *after* August 13, 2024—yet, it chose to initiate suit prematurely.[3] Thus, the obligations on Premier are not illusory.

Based on the plain language of the Confidentiality Agreement, OccuNet expressly waived its claims against Premier and TRPN. Thus, its claims must be dismissed. Because the issue of waiver is dispositive, the Court declines to consider the parties' remaining arguments.

CONCLUSION

For the above reasons, Premier's Motion to Dismiss (ECF No. 21) is **GRANTED**, and TRPN's Motion to Dismiss (ECF No. 24) is **GRANTED**.

---

[3] Additionally, the Court notes that Delaware law—governing any claims for breach of contract—features a three-year statute of limitations period for breach of contract claims. DEL. CODE ANN. tit. 10, § 8106 (West 2014). However, the limitations period does not begin to run until "the cause of action accrues, which is generally when there has been a harmful act by a defendant." *In re Tyson Foods, Inc.*, 919 A.2d 563, 584 (Del Ch. 2007). Thus, despite the limitations period, OccuNet could still have brought its claims against Premier. Even under this unbriefed theory of contractual liability, the waiver would not render the contractual scheme illusory.

**SO ORDERED.**

November 25, 2025

_____
MATTHEW J. KACSMARYK
UNITED STATES DISTRICT JUDGE

12